NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

_____

VANCE RODNEY BUTLER,  :
 :
        Plaintiff,  :  Civil No. 13-7488 (RBK)
 :
        v.  :  **OPINION**
 :
CAROLYN W. COLVIN, Acting  :
Commissioner of Social Security,  :
 :
        Defendant.  :
_____ :

**KUGLER**, United States District Judge:

This matter comes before the Court on an appeal filed by Plaintiff Vance Rodney Butler ("Plaintiff") from a decision of the Acting Commissioner of Social Security, Carolyn W. Colvin (the "Commissioner"), denying Plaintiff disability insurance benefits ("DIB"). The Court has jurisdiction to decide this appeal pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g). For the reasons expressed below, the Court will affirm the Commissioner's decision.

**I.   BACKGROUND**

    **A.  Procedural History**

On March 18, 2010, Plaintiff protectively filed a Title II application for a period of disability and DIB and a Title XVI application for supplemental security income ("SSI"). Tr. 17, 250. Plaintiff completed these applications as amended on April 8, 2010, alleging July 2, 2005 as the onset date of his disability. Tr. 203-05, 219. Plaintiff alleged disability due to back problems, depression, and anxiety. Tr. 261. On August 18, 2010, the Social Security Administration ("SSA") informed Plaintiff that he met their medical rules to qualify for

disability benefits, but that according to the medical evidence, Plaintiff's onset date of disability did not arise until October 31, 2009.  Tr. 102.  The SSA subsequently granted Plaintiff's claims in September 2010 on the basis of the October 2009 onset date.  Tr. 177-80, 106-19.

Disputing this later onset date, Plaintiff filed a request for reconsideration on September 9, 2010.  Tr. 104-05.  The SSA not only rejected Plaintiff's claim of the 2005 onset date, but also determined that he had not met the disability requirements at any time.  Tr. 120-22, 181-83.  Following this determination, Plaintiff filed a Request for Hearing before an Administrative Law Judge ("ALJ") on January 19, 2011.  Tr. 123-25.

Plaintiff first appeared before ALJ Frederick Timm on September 14, 2011.  Tr. 86-94.  The ALJ held a brief hearing, during which he scheduled another hearing and suggested Plaintiff obtain representation.  Tr. 90.  The ALJ held the second hearing on January 30, 2012, at which Plaintiff was represented by non-attorney representative Daniel Farrell.  Tr. 39-85.  At this hearing, Vocational Expert ("VE") Louis Szollosy testified regarding Plaintiff's ability to find employment in the national labor market based on his conditions.  Tr. 68-84.  The ALJ held a brief supplemental hearing on May 21, 2012, where he asked Plaintiff whether he had engaged in any kind of work activity since the last hearing, to which Plaintiff responded he had not.  Tr. 37.

On May 30, 2012, the ALJ issued his decision, finding that based on the application for period of disability and disability insurance benefits protectively filed on March 18, 2010, Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act.  Tr. 27.  Plaintiff subsequently filed a Request for Review of Hearing Decision with the Appeals Council on July 30, 2012.  Tr. 13.  The Appeals Council denied Plaintiff's request for review on October 18, 2013, prompting this current appeal.  Tr. 1-5.  In the interim, Plaintiff filed a subsequent

application with the SSA, which on May 16, 2014 found Plaintiff disabled as of November 21, 2013.  Pl. RBr. 1.

### B. Plaintiff's Physical and Mental Conditions and Medical History

Plaintiff alleges disability caused by back problems, depression, and anxiety.  The Court describes his impairments to the extent necessary for this Opinion.

#### 1. Plaintiff's Back Problems

Regarding Plaintiff's alleged back problems, the record first presents a report from Plaintiff's prior treating physician, Dr. Henry Morganstein, which indicates that Plaintiff suffered from chronic lumbar pain from August 2004 to May 2009.  Tr. 372.  Treatment notes from Dr. Morganstein dated from February 2009 to August 2009 indicate that Plaintiff underwent spinal surgery for a cervical herniated disc in 2001, but the notes did not include specific dates.  Tr. 22-23, 313.  Dr. Morganstein diagnosed Plaintiff with chronic lumbar pain that impeded his standing, stooping, lifting, or pushing, and noted that Plaintiff's conditions were relieved by muscle relaxants and other pain medications.  Tr. 22-23, 312-13.  However, a July 27, 2009 report from state medical consultant Dr. Melvin Golish indicated that Plaintiff failed to attend two orthopedic consultative examinations.  Tr. 391.

An MRI radiology report from Dr. Morganstein, dated August 24, 2010, revealed "multilevel spondylitic changes with significant foraminal stenosis, bilateral. . . ."  Tr. 357.  On November 23, 2011, Plaintiff visited Virtua Health complaining of hernia and five years of back pain, for which he received pain medication.  Tr. 363.  Plaintiff visited Virtua again on December 7, 2011, where he reported worsening musculoskeletal pain in his back, neck, and shoulders, and claimed an onset date of eight years prior.  Tr. 361-62.  Plaintiff next visited Virtua on January 11, 2012, where he claimed a pain level of "10" for his back pain, which he

3

now alleged had been present for ten years. Tr. 358-59. He also alleged for the first time that the pain was the result of a work injury dating back to 2002. Tr. 358-60. Plaintiff visited Virtua on March 8, 2012, and April 11, 2012, where he continued to complain of severe back pain, but acknowledged that the symptoms were relieved by the provided pain medications. Tr. 396-401. The April report also indicated that Plaintiff needed hernia surgery. Tr. 396. Lastly, on May 7, 2012, Plaintiff again visited Virtua to obtain pre-operative clearance for surgery. Tr. 393.

At his January 30, 2012 hearing, Plaintiff explained that he stopped working in 2005 in part because his back pain was too severe. Tr. 52. He explained that he found it painful to sit for more than half an hour before repositioning himself, and that he could not walk for more than ten or fifteen minutes without resting. Tr. 52-53. Plaintiff described his condition as a "sharp pain" and that he is in "discomfort all the time." Tr. 53. He further acknowledged that he was taking medication for his back pain. Tr. 65.

### 2. Plaintiff's Depression and Anxiety

Regarding Plaintiff's alleged depression and anxiety, on May 26, 2009, Plaintiff underwent a mental status examination with Dr. David Bogacki of CMC Psychiatric Associates. Tr. 308-11. At this examination, Plaintiff claimed he had been depressed since the death of his mother in 2005, and that his depression was exacerbated by the death of his brother in 2009. Tr. 308. Plaintiff stated that he had previously abused alcohol, but had not used alcohol for five years prior to the visit. Tr. 308. Plaintiff also stated that he was last employed at a nursing home following the death of his mother, but could not continue because of his depression. Tr. 308. Dr. Bogacki further reported that Plaintiff was homeless, but required no assistance on personal self-care tasks, was able to dress and groom himself, and was coherent. Tr. 309. Dr. Bogacki also reported that Plaintiff had a depressed mood, intermittent suicidal ideations without plan or

intent, difficulty completing tasks, and below average intellectual functioning "without evidence of organicity or mental deficiency." Tr. 309.  As a result, Dr. Bogacki diagnosed Plaintiff with depressive disorder.  Tr. 309.

On June 15, 2009, Plaintiff underwent a Mental Residual Functional Capacity Assessment with State psychological consultant Dr. Carol Bruskin.  Tr. 380-90.  Dr. Bruskin found that Plaintiff was depressive but had only moderate limitations that did not meet the listing requirements for disability benefits.  Tr. 389.  Specifically, she found Plaintiff could understand, remember, and execute simple responsibilities in the work environment.  Tr. 389.

On March 17, 2010, Plaintiff visited the emergency room at Our Lady of Lourdes Hospital, reporting depression and suicidal tendencies.  Tr. 315.  At that time, he stated that he smoked, drank brandy and beer every other day, and had recently smoked crack.  Tr. 316.  However, he stated to the nurse that he really did not want to hurt himself, and he had only said so in order to be seen faster.  Tr. 317.

On June 3, 2010, Plaintiff underwent a New Jersey Clinical Psychological Disability Evaluation with Dr. P. Lawrence Seifer.  Tr. 323-26.  At this evaluation, Plaintiff stated he had previously used cocaine and heroin, but not for six or seven years prior, and denied alcohol abuse.  Tr. 324.  Dr. Seifer noted Plaintiff had some limitations regarding his ability to concentrate, but had average intellectual functioning.  Tr. 324-25.  Under his "Assessment of Severity," Dr. Seifer noted, "Mr. Butler's moderate limitations are due to a combination of the mental and physical status and are enduring."  Tr. 325.

On July 19, 2010, Plaintiff underwent an examination with State psychological consultant Dr. Thomas Yared, who found Plaintiff met listing 12.04 for Affective Disorders for depressive syndrome, characterized by symptoms including loss of interest in all activities, difficulty

5

concentrating or thinking, and thoughts of suicide. Tr. 327-29. Dr. Yared found that Plaintiff had "Marked" functional limitations in "Restriction of Daily Living Activities, Difficulties in Maintaining Social Functioning, and Difficulties in Maintaining Concentration, Persistence, or Pace." Tr. 335. The "Marked" designation satisfies the functional criterion for disability. Tr. 335. In his consultant's notes, Dr. Yared based his determination in part on Plaintiff's March 2010 emergency room visit and noted Plaintiff's complaint of suicidal ideation. Tr. 337.

On November 3, 2011, Dr. Jane Curran performed a psychiatric review of Plaintiff, and disagreed with the prior decision of Dr. Yared. Tr. 338-55. Where Dr. Yared had found "Marked" limitations, Dr. Curran found mild and moderate limitations, which do not satisfy the functional criterion for disability. Tr. 348. Dr. Curran based her determination on the inconsistencies of Plaintiff's reports on his substance abuse, as well the emergency room report where Plaintiff had admitted to feigning suicidal ideation in order to be seen faster. Tr. 354. Dr. Curran also referenced Dr. Seifer's prior determination that Plaintiff had average intellectual functioning. Tr. 354. She thus determined Plaintiff could meet the basic mental demands of unskilled work and reversed the prior decision. Tr. 354-55.

At the January 30, 2012 hearing, Plaintiff admitted to using drugs and alcohol in the past as "pain medication." Tr. 56. He also stated he had been having psychological problems following several deaths of his close family members, most notably his mother and brother. Tr. 56-58. When asked by the ALJ about the inconsistences in his drug use history, Plaintiff stated that he must have misunderstood the questions and could only have been referring to the time he spent in Georgia from 1998 to 2003, during which he was drug free. Tr. 60-63.

**C. Plaintiff's Work History**

Plaintiff is a currently a 57-year old individual who resides in Camden, New Jersey. Tr. 47. Plaintiff completed high school and subsequently received vocational training as a machinist in 1976. Tr. 49. He is also a certified nurse's assistant. Tr. 49. Plaintiff's longest full-time job was at Campbell's Soup, where he worked as a forklift operator from 1990 to 1998. Tr. 50-51, 278. For his next-longest jobs, Plaintiff worked at Cooper Hospital in Camden and St. Mary's hospital in Georgia as a nurse's assistant from 1998 to 2005. Tr. 51, 278. His duties included lifting patients and turning them in bed. Tr. 294. However, Plaintiff stated that by the year 2005 he could no longer do this work because of the physical pain, and because of the mental impact of his mother's death. Tr. 52-53. Plaintiff attempted to work as a laborer in 2009, but was only able to work the job for a few days. Tr. 249, 292.

## II.     LEGAL STANDARDS

### A. Standard of Review of Commissioner's Decision

District court review of the Commissioner's final decision is limited to ascertaining whether the decision is supported by substantial evidence. Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Morales v. Apfel, 225 F.3d 310, 316 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)). If the Commissioner's determination is supported by substantial evidence, the Court may not set aside the decision, even if the Court "would have decided the factual inquiry differently." Fargnoli v. Masanari, 247 F.3d 34, 38 (3d Cir. 2001) (citing Hartranft, 181 F.3d at 360). A district court may not weight the evidence "or substitute its conclusions for those of the fact-finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).

Nevertheless, the reviewing court must be wary of treating "the existence vel non of substantial evidence as merely a quantitative exercise" or as "a talismanic or self-executing formula for adjudication." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.") The Court must set aside the Commissioner's decision if the Commissioner did not take into account the entire record or failed to resolve an evidentiary conflict. Schoenwolf v. Callahan, 972 F. Supp. 277, 284-85 (D.N.J. 1997) ("Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.") (quoting Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978)). Furthermore, evidence is not substantial if it constitutes "not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (citing Kent, 710 F.2d at 114).

### B. The Five-Step Disability Inquiry

The Commissioner conducts a five-step inquiry to determine whether a claimant is disabled, and therefore eligible for DIB and SSI benefits. 20 C.F.R. § 404.1520(a)(4); Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). The Commissioner first evaluates whether the claimant is currently engaging in any "substantial gainful activity." 20 C.F.R. § 404.1520(b). Such work activity bars the receipt of benefits. Id. The Commissioner then ascertains whether the claimant is suffering from a severe impairment, meaning "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic

work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have such a severe impairment that limits his ability to do basic work activities, the claim will be denied. Id. If the Commissioner finds that the claimant's condition is severe, the Commissioner moves to the third step and determines whether the impairment meets or equals the severity of a listed impairment. 20 C.F.R. § 404.1520(d). If the condition is equivalent to a listed impairment, then it is presumed that the claimant is entitled to benefits; if not, the Commissioner continues to step four to evaluate the claimant's residual functional capacity ("RFC") and analyze whether the RFC would enable the claimant to return to his "past relevant work." 20 C.F.R. § 404.1520(f). If the Commissioner finds the claimant unable to resume past relevant work, in the fifth and final step, the Commissioner determines whether the claimant can adjust to other work. 20 C.F.R. § 404.1520(g). If the claimant has the capacity to perform other work available in significant numbers in the national economy, based upon factors such as the claimant's age, education and work experience, the claimant will be found not disabled. Id. If the claimant cannot make an adjustment to other work, he will be found to be disabled. Id.

### III. DISCUSSION

#### A. The ALJ's Decision

The ALJ determined that Plaintiff was not entitled to disability benefits because he could perform work that exists in significant numbers in the national economy. Tr. 26. The ALJ began his analysis by finding that Plaintiff had not engaged in substantial gainful activity since his alleged disability onset date of July 2, 2005. Tr. 19. Moving to the second step, the ALJ found that Plaintiff had the severe impairments of "status/post cervical spine surgery in 2001, low back pain, dysthymic disorder, anxiety disorder and polysubstance abuse," which caused more than a minimal limitation in Plaintiff's ability to perform basic work activities. Tr. 19. At step three,

9

the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1. Tr. 20-21.

Moving to the step four RFC determination, the ALJ found that Plaintiff had the RFC to perform a range of light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), except that "he cannot climb ladders, ropes or scaffolds, can occasionally climb stairs, balance, stoop, kneel, crouch, and crawl; and he can occasionally reach overhead bilaterally." Tr. 21. The ALJ further found that Plaintiff "is limited to unskilled work, goal-oriented rather than production paced tasks, and can have only occasional interaction with the public, supervisors and coworkers." Tr. 21. After considering the evidence, the ALJ found that "Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, his statements concerning the intensity, persistence and limiting effects of the symptoms were not credible to the extent that they were inconsistent with the . . . RFC assessment." Tr. 22.

Regarding Plaintiff's alleged back impairment, the ALJ found the medical evidence did not substantiate Plaintiff's allegation of disability. Tr. 22. The ALJ considered the reports from Dr. Morganstein, the record of Plaintiff's visits to Virtua, and the report of Dr. Golish that Plaintiff "had failed to attend two orthopedic consultative examinations." Tr. 23. As such, the ALJ found that the severity of Plaintiff's back impairment was "not supported by any objective medical findings or treatment history" on the basis that the record showed only "sporadic primary care," "infrequent emergency room visit for refills or changes in pain medications," and that Plaintiff "admitted that his condition responded to pain medication." Tr. 25.

Regarding Plaintiff's allegations of depression and anxiety, the ALJ relied on the reports from Dr. Bogacki, Dr. Seifer, Dr. Bruskin, and Dr. Curran to find that Plaintiff's psychiatric

10

conditions did not prevent him from performing a range of light work. Tr. 25. In particular, he based this determination on Plaintiff's feigning of a suicide attempt to seek faster treatment, as well as his failure to accurately disclose his substance abuse history. Tr. 25. The ALJ also gave little weight to the findings of Dr. Yared on the basis that Dr. Yared had relied in error on Plaintiff's credibility. Tr. 25. Concluding step four, the ALJ found that Plaintiff was unable to return to any past relevant work. Tr. 25.

Finally, at step five, considering Plaintiff's age, education, work experience, and RFC, the ALJ found there were significant jobs in the national economy that Plaintiff could perform. Tr. 26. In making this determination, the ALJ relied on the testimony of the VE, who stated that Plaintiff's conditions would allow him to perform the jobs of: mail clerk, for which there are 120,000 jobs in the national economy and 3,800 jobs in the Camden and Philadelphia region; bottling line attendant, for which there are 677,000 jobs in the national economy and 14,000 jobs in the Camden and Philadelphia region; and cleaner/housekeeper, for which there are 865,000 jobs in the national economy and 11,000 jobs in the Camden and Philadelphia region. Tr. 26.

> The VE reached these figures based on the following hypothetical from the ALJ:
>
> I'd like you to assume an individual born on July 19, 1957. That's an individual closely approaching advanced age most of the time under consideration although the original alleged onset date was prior to age 50. A high school graduate with several past relevant work occupations you've identified. Light exertion generally, never to climb ladder, rope, scaffold; other postural activities occasional . . . . Also no more than occasional reaching overhead bilaterally. And in the mental domain: unskilled tasks. . . . Limited to unskilled tasks. Limited to goal-oriented rather than production paced tasks, and limited to occasional interactions with the general public, supervisors, and coworkers.

Tr. 73. Furthermore, on the basis of the distinction between "goal-oriented" and "production paced" jobs, the VE eroded the available jobs that Plaintiff could perform by 25% for mail clerk positions, 50% for bottling line attendant positions, and 25% for housekeeping positions. Tr. 74-75. The VE explained the distinction between "production paced" and "goal-oriented" as the

11

difference between needing to produce a certain number of products in a given time period (production paced) versus quality control (goal-oriented), but conceded that all jobs have some elements of time constraints. Tr. 79-82. The VE made this determination based on his "30 years experience in the work force and actually analyzing a lot of those jobs." Tr. 81. He also stated that this determination was consistent with the Dictionary of Occupational Titles ("DOT"). Tr. 75.

Based on this testimony, the ALJ determined that Plaintiff could make a successful adjustment to other work that exists in the national economy, thus making an ultimate finding of "not disabled." Tr. 26.

### B. Plaintiff's Arguments

Plaintiff claims the ALJ erred in two ways. First, Plaintiff argues the ALJ's finding that the Commissioner had met the burden of proof at step five regarding the number of alternate jobs in the national economy was not supported by substantial evidence. Pl. Br. 12. Plaintiff argues that the phrase "goal-oriented rather than production paced" cannot be said to be meaningful in the context of vocational requirements, and thus the ALJ erred in the determination that there are other jobs in the market at sufficient numbers which Plaintiff could perform. Pl. Br. 12-18. Second, Plaintiff argues that the ALJ failed to give proper weight to the opinion evidence of Dr. Yared based on the erroneous assumption that Dr. Yared had relied in error on the Plaintiff's reports of his alcohol and drug use history. Pl. Br. 19-21. Plaintiff thus argues that had the ALJ given proper weight to Dr. Yared's opinion, he would have found Plaintiff entitled to benefits at step three of the sequential analysis. Pl. Br. 20.

### C. Analysis

### 1. The ALJ's Conclusion at Step Five as to the Availability of Jobs in the National Economy was Based Upon Substantial Evidence

At step five, the burden of proof is on the Commissioner to show that Plaintiff can perform another job besides his past work.  Smith v. Comm'r of Soc. Sec., 631 F.3d 632, 634 (3d Cir. 2010).  "In the course of drawing a conclusion as to step five, the ALJ may rely on testimony from a vocational expert."  Yensick v. Barnhart, 245 Fed. App'x 176, 180 (3d Cir. 2007) (citing Rutherford v. Barnhart, 399 F.3d 546, 551 (3d Cir. 2005)).  Here, the ALJ accepted the testimony of the VE in finding, based on Plaintiff's age, education, work experience, and RFC, that substantial jobs exist in the national economy that Plaintiff could perform.  Tr. 26.  The ALJ also accepted the testimony of the VE regarding the erosion percentages based on the distinction between "goal-oriented" and "production paced" jobs.  Tr. 26.

Plaintiff argues that the hypothetical question the ALJ posed to the VE regarding the distinction between "goal-oriented" and "production paced" cannot be said to be meaningful in the context of vocational requirements.  Plaintiff contends that while the VE established that quality control was the difference between goal-oriented and production paced tasks, he "oscillated between rate and quality, neither of which he was able to distinguish in terms of employability.  He was hesitant to say that one could work slower in goal-oriented tasks, and he did not say that one's quality could lag in production paced tasks."  Pl. Br. 14-15.  Plaintiff stresses that "at both goal-oriented and production paced tasks, the employee is expected to maintain a competitive rate and quality," and that "failure on the part of the employee to maintain a competitive rate at a consistent quality will reasonably result in termination."  Pl. Br. 17.  Thus, Plaintiff insists that the jobs the VE determined that Plaintiff could perform could be reasonably considered as both goal-oriented and production paced, and that the VE "did not

vocalize a reasonably reproducible test or definition that can be applied to diverse positions that can reliably draw real world distinctions." Pl. RBr. 6.

Plaintiff fails to cite a single case in which courts have held the distinction between goal-oriented and production paced to be meaningless or insufficient. Instead, Plaintiff's argument relies entirely on quotations from the VE in hearing transcripts, which he construes as a failure on the part of the VE to properly understand the distinction between goal-oriented and production paced. Pl. RBr. 4.

In contrast, the Commissioner cites several cases where courts have recognized the distinction between goal-oriented and production paced work, although they do not specifically address whether the distinction itself is meaningful. For instance, in Johnson v. Colvin, the court upheld an ALJ's determination that the plaintiff was limited to goal-oriented work rather than "production rate pace." No. 13-240E, 2014 WL 1891313, at *10 (W.D. Pa. May 12, 2014). However, this distinction was only mentioned once, and was not challenged by the plaintiff in that case. Id. The distinction also appears in Arlow v. Colvin, No. 2:13cv99, 2014 WL 1317606, at *8 (W.D. Pa. March 28, 2014), but again was mentioned in passing and was unchallenged by that plaintiff.

This district recently recognized the goal-oriented versus production paced distinction in Breslin v. Comm'r of Soc. Sec., where the plaintiff argued in part that the ALJ erred by failing to define goal oriented versus production paced. No. 13-1190, 2014 WL 936441, at *8 (D.N.J. Mar. 10, 2014). However, in Breslin, the court did not consider plaintiff's argument because plaintiff did not explain its probative value to the RFC analysis at step four. Id. at *13. Furthermore, the analysis in Breslin did not reach step five of the sequential process, which is at issue here. Id. at *14. This district also recognized the validity of this distinction in Lippincott

14

v. Comm'r of Soc. Sec., 982 F. Supp. 2d 358, 367 (D.N.J. 2013), although the meaning of the terms was not challenged in that case. See also Craig v. Comm'r of Soc. Sec., No. 13-4454, 2014 WL 6667216, at *4 (D.N.J. Nov. 21, 2014) (affirming the ALJ's ruling where the plaintiff was limited to goal-oriented rather than production paced tasks).

The Court finds that the distinction between goal-oriented and production paced jobs is a meaningful distinction that is recognized by courts in Social Security proceedings. The Court further finds that the VE understood this distinction and that his testimony was consistent with these terms. As elucidated by the Commissioner, the VE distinguished "production paced" as a "stressful situation," and "goal-oriented" as "quality control." Def. Br. 9. The VE testified, for example, that a job as a mail clerk in a post office would be a production paced job because of the need to process a high volume of mail, whereas a job as a mail clerk in a private sector office such as an attorney's office would be goal-oriented because of the lesser pace. Tr. 79. Based on Plaintiff's lack of any legal authority to support his position, and this Court's review of the statements of the VE, we hold that the VE's understanding of the distinction did not render the terms "meaningless." Therefore, the ALJ properly relied on the VE's testimony to make his finding.

Plaintiff further argues that the VE's figures for erosion, which he estimated based on his "30 years in the work force," were arbitrary and made without a reliable method. Pl. Br. 17. Specifically, he argues that a VE may not rely solely upon his own experience in making a determination about the workforce. Pl. RBr. 7.

In Horodenski v. Comm'r of Soc. Sec., the Third Circuit held that a VE may rely on personal years of experience and recollection, in addition to Department of Labor ("DOL") surveys, in making a determination that work exists in sufficient numbers in the national

15

economy.  215 Fed. App'x 183, 189-90 (3d Cir. 2007).  Likewise, in Woods v. Finch, the Third Circuit gave credence to the testimony of a VE who relied on his own experience in addition to the DOT.  428 F.2d 469, 470 (3d Cir. 1970).  In fact, courts have encouraged VEs to rely on their own experiences rather than solely on the DOT.  See Robinson v. Richardson, 360 F. Supp. 243, 249 (E.D.N.Y. 1973).   Plaintiff argues that here the VE relied solely on his own experience, and not his experience in conjunction with DOL surveys or the DOT, making this case distinguishable from the above cited cases.  Pl. RBr. 7.  However, Plaintiff is incorrect in stating that the VE relied solely on his own opinion – the VE clearly stated that his information was consistent with the DOT.  Tr. 75.  On this basis, the ALJ was entitled to accept the testimony of the VE.

The Court notes that Plaintiff's RFC, limiting him to goal-oriented rather than production paced work, is favorable to Plaintiff in that it required the VE to erode the number of jobs potentially available to Plaintiff in the national economy.  The VE eroded the job of mail clerk by 25%, reducing the number of jobs available nationally to 90,000 and regionally to 2,850; the job of bottling line attendant by 50%, reducing the number of jobs available nationally to 338,500 and regionally to 7,000; and the job of cleaner/housekeeper by 25%, reducing the number of jobs available nationally to 648,750 and regionally to 8,250.  Courts have found that jobs exist in significant numbers in the economy based on much smaller numbers than these.  See Martin v. Barnhart, 240 Fed. App'x 941, 943 (3d Cir. 2007) (finding that two unskilled light exertional occupations, with 2,300 and 1,054 respective jobs locally and 260,000 and 150,600 respective jobs nationally, existed in the economy in significant numbers).  Thus, the Court finds that there was substantial evidence that Plaintiff could perform work that exists in significant numbers in the national economy.

### 2. The ALJ Properly Weighed the Opinion of Dr. Thomas Yared

Plaintiff argues that the ALJ erred in granting little weight to the opinion of Dr. Yared. Pl. Br. 19. The ALJ made this determination on the basis that Dr. Yared had erroneously relied on Plaintiff's credibility despite the inconsistencies in Plaintiff's substance abuse history, and Plaintiff's admission that he only feigned suicidal ideation in order to be seen faster at the emergency room. Pl. Br. 20, Tr. 24-25. Plaintiff argues that had the ALJ given proper weight to Dr. Yared's determination, the ALJ would have found Plaintiff met listing 12.04, entitling him to benefits at Step three of his analysis. Pl. Br. 20. To support this argument, Plaintiff cites Dr. Yared's consultative notes, which indicate that Dr. Yared had reviewed the previous consultative examinations, and thus was aware that Plaintiff had feigned suicidal ideation. Pl. Br. 20. Plaintiff argues that since Dr. Yared actually was aware of Plaintiff's actions, Dr. Yared did not make a mistake, and his opinion should not have been discounted by the ALJ. Pl. Br. 20.

Even if Dr. Yared was fully aware of the inconsistencies and feigned suicidal ideation, and despite these facts still found Plaintiff met listing 12.04, the ALJ was entitled to his determination based on the conflicting nature of the medical evidence. As the trier of fact, the ALJ has the duty to resolve conflicting medical evidence. Hatton v. Comm'r of Soc. Sec., 131 Fed. App'x 877, 880 (3d Cir. 2005) (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)). Where there is conflicting medical evidence, "the ALJ may choose whom to credit, but must give reasons for discounting the evidence." Richardson v. Comm'r of Soc. Sec., No. 12-6422, 2013 WL 5816883, at *7 (D.N.J. Oct. 29, 2013) (citing Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)). "A reviewing court should not re-weigh the medical opinions of record but should consider only whether the ALJ's weighing of such options was supported by substantial

evidence." Hatton, 131 Fed App'x at 880 (citing Monsour Med. Ctr. v. Heckler, 806 F.3d 1185, 1190 (3d Cir. 1986)).

Here, as noted by the ALJ, Dr. Yared's opinion was clearly inconsistent with the opinions of Dr. Bruskin and Dr. Curran, both of whom determined that Plaintiff's medical issues did not rise to the level required for a finding of disability. Tr. 25. The ALJ also cited the opinions of Dr. Seifer and Dr. Bogacki, which he felt corroborated the opinions of Dr. Bruskin and Dr. Curran. Tr. 25. Indeed, Dr. Seifer described Plaintiff's limitations as "moderate" and explained that he had average intellectual functioning. Tr. 324-25. Dr. Bogacki stated that Plaintiff's intellectual functioning is "below average" but "without evidence of organicity or mental deficiency." Tr. 309.

Social Security Regulation 20 C.F.R. § 404.1527(c)(4) states "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." Thus, even if Dr. Yared was fully aware of Plaintiffs misrepresentation, his opinion serves as an outlier and is notably inconsistent with the record as a whole. It is apparent from the record that although Plaintiff did suffer from both physical and psychological ailments, his conditions did not rise to the level required for a finding of disability. Dr. Yared's finding stands out, especially when compared to the opinions of the other four doctors who examined Plaintiff. For these reasons, the ALJ's decision to discount Dr. Yared's opinion was supported by substantial evidence.

**IV. CONCLUSION**

For the foregoing reasons, the Court will affirm the Commissioner's final decision. An appropriate order shall issue.

Dated: 2/11/2015                                        s/ Robert B. Kugler
                                                              ROBERT B. KUGLER
                                                              United States District Judge